HARDY,, Judge.
This is a suit in which plaintiffs seek the recovery of an undivided one-eighth of the natural gas produced by the defendant company, or the cash value thereof which has been fixed in the sum of $1,102.-58. After trial there was- judgment in favor of plaintiffs in the amount above set- forth, from which judgment defendant has appealed. '
There is no dispute as to the material facts.’ In 1944 Osborne J. Dykes was the owner of a tract" of land situated in Red River Parish, Louisiana, containing 636 acres, more or less. By proper deeds of conveyance executed, filed and recorded during the year 1944 Dykes conveyed an undivided one-fourth interest in the min-.erais in the said property to each of his three sons. By deed dated August 7, 1945 and recorded August 8, 1945 in the Conveyance Records of Red River Parish, Dykes sold and conveyed the property to Theodore L. Gray, reserving to himself one-half of the minerals in the said property. On August "8, 1945, Dykes and his three sons executed an oil, gas and mineral lease to The Texas Company, the defendant ip this suit, which lease was filed and recorded in the Conveyance Records of Red River Parish on August 23, 1945. The lease purported to cover the full interest in the property described and The Texas Company was not informed as to any outstanding mineral interest which was not covered by the lease. By deed dated February 28, 1950 Gray conveyed the property to P. Lyndon Huckabay, Pugh T. Huckabay and wife, Mrs. Verda McNaughton Huckabay, J. Philip Smith and wife, Mrs. Vera Huck-abay Smith. These parties, together with Henry W. Bethard, Jr. and Henry W. Bethard, III, members of the law partnership of Bethard & Bethard, are the plaintiffs in this suit. On September 25, 1950 Pugh T. Huckabay addressed a letter to The Texas Company informing the said company that he and his co-owners claimed title to the property described, which title included the entire surface of the land and a mineral interest believed to be an undivided one-eighth therein. On November 22, 1950 an attorney-at-law in the employ of The Texas Company rendered an opinion recognizing title of the Huckabays to the surface and a one-eighth of the minerals in the property and setting forth The Texas Company as full owner of the leasehold interest. The law partnership of Bethard and Bethard, composed of Henry W; Bethard, Jr. and Henry W. Bethard, III, ácquired an undivided one-fourth of one-eighth of the minerals in the property by conveyance from the Huckabays on *323 June 13, 1951. On November 4, 1951, The Texas Company drilled a well on the property, which well, known as Dykes Well No. 2, was completed as a gas producer at a total cost of $110,150.59. This suit was filed December 22, 1952.
There are other facts appearing in the record which, however, we think it unnecessary to detail, inasmuch as they have no material bearing upon the issues of the case. Among these facts is evidence of the filing of a suit, accompanied by the filing of a notice of lis pendens, by the Huckabay plaintiffs against O. J. Dykes seeking a declaratory judgment fixing the mineral interests of said parties with respect to this and other tracts of land, which action was settled by a compromise agreement recognizing the Huckabays as owners of an undivided one-eighth of the minerals in this particular property. We further note in brief of counsel for defendant reference to a supplemental opinion by its attorney under date of September 29, 1952, recognizing the ownership of plaintiffs of a one-eighth mineral interest, which exhibit, however, is not incorporated in the record before this court. There is also included in the said brief a statement of an offer to plaintiffs by an official of The Texas Company of the choice of joining the said company in the operation on the property or of ratifying the Dykes lease and receiving a proportionate part of the royálties from the production. This statement is not substantiated by anything that we find in the record and, to the contrary, the plaintiff, Pugh J. Huckabay, the writer of the letter of September 25, 1950, testified positively and emphatically that no proposal for lease had been made by The Texas Company.
The court has been favored by exceedingly able, instructive and informative briefs, filed by counsel for the respective parties litigant, despite which, however, it has found determination of the issue presented to be fraught with considerable difficulty.
The defense to plaintiffs’ demands is found in the contentions, first, that defendant as lessee of the owners of mineral servitudes on a tract of land, which servi-tudes were acquired from the sole owner of the surface of said tract, is vested with the right to enter upon said land in the exercise of the servitude; second, that defendant in good faith believed itself to be the owner of the whole leasehold interest on the property involved; and, third, that defendant is liable only for the return of the value of plaintiffs’ proportionate interest in the recovery of the gas produced from Dykes No. 2 well, less their proportionate part of the drilling and operating expenses. It is asserted that the third proposition is true regardless of the status of defendant either as lessee" in good faith, lessee in legal bad faith, or, with respect to plaintiffs’ interest, as lessee in moral bad faith even to the extent of being a willful trespasser.
We have experienced no difficulty in resolving the first proposition for we think the jurisprudence is clear on the point that the lessee of servitude owners, who had acquired such servitudes from the owner of both the whole of the land and the minerals, is entitled to entry upon the land for the purpose of drilling and producing oil or gas; Starr Davis Oil Company, Inc., v. Webber, 218 La. 231, 48 So.2d 906; Union Sulphur Company, Inc. v. Lognion, La.App., 26 So.2d 845; Clark v. Tensas Delta Land Company, 172 La. 913, 136 So. 1. The correctness of this principle is at least impliedly recognized by counsel for plaintiffs. In this case it is an admitted fact that when Dykes conveyed an undi vided one-fourth interest in the minerals to each of his three sons, and when he reserved an undivided one-eighth of the minerals to himself, he was the sole owner of the whole of the land. It therefore follows that defendant, The Texas Company, was the lessee of the owners of servitudes who had acquired from one who owned both the land and the minerals. The conclusion, based upon the facts above cited and considered in connection with the legal principle enunciated in the cases cited supra, that The Texas Company was vested with the right to enter upon the *324 property, to drill and to conduct operations for the production of minerals therefrom is inescapable.
Much of the argument of counsel, in fact all of their argument with the exception of such part as concerns the above holding, has been devoted to a detailed consideration of the question of good or bad faith, the degree thereof and the consequent effect upon the extent of liability of defendant. In our opinion no question of good or bad faith is pertinent or material to the issue presented for we are firm in the belief that one who properly exercises a right conferred by operation of law cannot be subject to a charge of bad faith in any degree.
Unfortunately, the above conclusion does not satisfactorily determine the question of the nature and degree of reimbursement, from the production of oil or gas, to which the plaintiffs are entitled. The question may be presented as follows:
Is the owner of an undivided interest in minerals entitled to payment of his proportionate interest in production recovered by one who is also the owner, or the lessee thereof, of an undivided interest by whose effort and at whose expense the production of minerals has been procured, without deduction for costs of development and production ?
We concede the obvious fact that valid arguments may 'be, and have been, advanced in support of both affirmative and negative answers. The courts of this state, in numerous instances, have touched the “hem of the garment” of the substance of the question, but never, so far as we have been able to determine, has the answer been squarely and definitely enunciated. An excellent, though brief, discussion of the proposition is found in Daggett’s Mineral Rights in Louisiana, Section 55, verbo Expenses. The author concluded:
“Apparently the question is one of fact and circumstance for which no ' iron clad rule can be laid down.”
In her discussion Mrs. Daggett particularly considered Martel v. Jennings-Heywood Oil Syndicate, 114 La. 351, 38 So. 253; Allies Oil Company v. Ayers, 152 La. 19; 92 So. 720; Connette v. Wright, 154 La. 1081, 98 So. 674; Southwestern Gas & Electric Company v. Liles, 16 La.App. 500, 133 So. 835, and Freeman v. Depression Oil Company, La.App., 159 So. 192, which case referred to Thornton on Gas & Oil, Fourth Edition, Volume 1, page 793, paragraph 321.
We further note with interest the quotation by Mrs. Daggett from Allies Oil Company v. Ayers, supra [152 La. 19, 92 So. 721] :
“The fact is that when parties own lands or leases or other property in common and cannot agree between themselves, the obvious course for •them to follow is to demand a partition thereof between them.”
But the holding of the Supreme Court as pronounced in the opinion by Mr. Justice McCaleb in Starr Davis Oil Company, Inc. v. Webber, cited supra, refused a partition under facts analogous to those presented by the instant case.
If then, as it appears, there is no firm and certain rule of law or jurisprudence which is applicable to every case, we are, perforce, confronted with the necessity of resolving and pronouncing a principle which will sustain a just and equitable judgment under the particular facts here presented.
The opinion in the Starr Davis case is most appropriate as to the clarification of the rights of the parties plaintiff and defendant in the instant case. Plaintiffs and defendants were vested with two absolute, independent and coexistent rights, and each was possessed of the absolute right to explore for and to produce minerals subject only to a restriction as to the amount of minerals that either might take into possession. While this is a clear determination of the mutual rights of the parties,' it offers no solution with respect *325 to the fixing of attendant liabilities. Even the restriction as stated in the Starr Davis case is somewhat lacking in exactness from a practical standpoint. Considering the fugacious nature of oil and gas, it is not possible to reduce an exact part to possession, but, rather, the whole must be taken into physical possession before any mathematically precise division can be determined.
To illustrate; under the facts of the instant case it is clear .that defendant, The Texas Company, had the right to drill a well (to explore), to bring fugitive minerals out of the earth to the surface thereof (.to produce) and to store such minerals (to reduce to possession). At the end of these successive steps, which together constitute the term “operations”, The Texas Company found itself in actual possession in this instance of a quantity of natural gas of a marketable, saleable value. But under the specific wording of the Starr Davis opinion The Texas Company was entitled to take and .to exercise its right of ownership only to the extent of seven-eighths of the amount of gas which it recovered.
The identical rights were possessed by the plaintiffs, the only difference being that upon completion of their independent operations they would have been entitled to exercise ownership only with respect to one-eighth of the natural gas .they had recovered.
Thus we arrive at the conclusion that this defendant, The Texas Company, is completely justified in its action in drilling, producing and marketing the natural gas recovered. But what was its attendant liability ?
In the effort to find the answer to this question we are confronted with the necessity of considering the loss or impairment of the rights of plaintiffs. First, the plaintiffs were deprived of the freedom to contract or otherwise to exercise .their rights of ownership; second, they were deprived of benefits in the nature of bonuses and annual rentals which would have accrued as the result of the execution of a contract of lease with reference to their undivided one-eighth interest in the minerals; and, third, they have been deprived of the receipt of royalty' payments which would have accrued under such a contract of lease.
At this stage, unless there is some relief resulting from this action, plaintiffs are confronted with the unenviable choice of relinquishing their hopes of realizing anything of value from their rights of ownership, or of yielding to .the contention of the defendant under which plaintiffs would be entitled to a credit of one-eighth of the value of the total production from the Dykes No. 2 well ($8,820.66), which would be the sum of $1,102.58, as against an indebtedness of one-eighth of the total cost of drilling, equipping and operating the said well ($117,506.11), which would be the sum of $14,688.26. This, indeed, would appear to involve a “Hobson’s choice” for under neither alternative could any benefit be derived by plaintiffs.
On the other hand, certain circumstances may be imagined under which the inequities of a particular case might work a hardship upon one who had expended substantial sums in the development of minerals. Such a condition was actually considered by the Supreme Court in Wetherbee v. Railroad Lands Company, Ltd., 153 La. 1059, 97 So. 40, 43, and was disposed by the court as follows:
“Plaintiffs complain of the judgment in reconvention for the expenses and expenditures of defendants in developing an oil field upon the property. We are convinced from all the circumstances that a failure to make this allowance would, in effect, permit the plaintiffs to enrich themselves at the expense of the defendants; that equity, fair dealing, and law require that they should make the reimbursement,' especially since they stood by and permitted the defendants to make the outlay and incur the expense for their benefit without protest, or at least *326 without resorting to proper legal remedies until oil had been discovered.”
In the instant case there can be no charge that plaintiffs “stood by and permitted” the development of the land by defendant without protest. The Texas Company was given written notice of plaintiffs’ claims within a few months following their acquisition of the land and a mineral interest. It is true that defendant, in support of its assertion of complete good faith, tenders the proposition that the opinion of its attorney after examination of title was to the effect that the company held a valid lease on the whole interest. However, it clearly appears that this conclusion was completely erroneous and the attorney himself in his testimony made no' effort to justify nor excuse the error. We forbear further comment on this point, being fully aware that “Quandoque bonus dormi-tat Homerus”.
It is further to be observed, despite the declarations in counsel’s brief, that the record contains no indication of any effort on the part of The Texas Company to make any sort of lease agreement with reference to the outstanding interest even after, presumably, the attorney's error in the original opinion was detected.
These plaintiffs, in effect, were caught in a “squeeze”, for they could neither undertake the substantial expenditures necessary to a recovery of their fractional interest in minerals, nor could they prevent the development by The Texas Company to their corresponding detriment and the depletion of their interest in the minerals. This dilemma unquestionably prejudiced the rights of plaintiffs and resulted in damage.
We are convinced under the facts here presented that the defendant has failed to observe that principle of conduct which closely approaches the concept of Divine justice evidenced by the maxim “Sic utere too ut alienum non laedas”.
Coincident with the rights vested in, assumed and exercised by the defendant, there existed a corresponding responsibility which it should be required to discharge. The only basis for reparation that may be availed in this instance lies in the granting of the relief prayed by plaintiffs.
For the reasons assigned the judgment from which appealed is affirmed at appellant’s cost